## Nelson, Executor, Appellant, *v.* Eachel et al.

[Marked to be reported.]

*Judgment notes—Indorsement— Contract—Waiver—Oil well — Question for jury.*

A judgment note given in payment of a bonus under an oil lease was indorsed as follows : "This note to be paid within two months after the year expires on lease No. 1 on east part of the farm, provided the well on said lease should prove good paying well ; the well to be completed within the year." The proofs showed that the indorsement was made in the handwriting of one of the makers of the note, and that the note remained in the hands of the payee without the makers having had any access to it. There was evidence that the payee agreed that in place of the well contemplated by the indorsement, which was not drilled, a test well should be made by the makers of the note, on another lease on the payee's farm

within the year, and that this should be a sufficient compliance with the memorandum indorsed on the note. There was also evidence that such a well had been drilled within the time required and no oil found. *Held*, that the case was for the jury, and that a verdict and judgment for defendants should be sustained.

Argued Oct. 10, 1893. Appeal, No. 92, Oct. T., 1893, by plaintiff, John Nelson, executor of R. W. Stewart, deceased, from judgment of C. P. Beaver Co., March T., 1892, No. 257, on verdict for defendants, Charles Eachel and John D. Irons. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Issue to determine validity of judgment. Before WICK-HAM, P. J.

The facts appear by the charge, as follows:

"This action is based on a judgment note dated April 25, 1889, the amount of the note being for three hundred dollars, and the time of payment fixed therein being one year. I speak now of the face of the note alone. On the back of the instrument is the following memorandum: 'This note to be paid within two months after the year expires on lease No. 1, on east part farm; provided the well on said lease should prove a good paying well. The well is to be completed within the year.'

"Now, gentlemen, the first question for us to consider is one partly of law and partly of fact, partly for the court to decide, and partly for you to pass upon. And I say to you, as a matter of law, that if this memorandum were on the back of the note at the time the instrument was delivered, it is as much a part of the note as if it were written upon the face thereof, and just as binding upon the parties. If it were not there at that time, if it were placed upon the note thereafter, then it would be entirely inoperative and no defence could be based thereon. The plaintiff in that event would be entitled to recover the full amount of the note, with interest and attorney's commissions.

"Now, gentlemen, what is the evidence as to the memorandum as to the time when it was placed on that note? [In the first place, gentlemen, it is shown here that this note came from the custody of R. W. Stewart just as it appears to-day. Mr. Nelson, the attorney for the plaintiff, testifies that when he re-

ceived the note as attorney for Mr. Stewart, that is, in the latter's lifetime, this indorsement appeared on the note as it is. Consequently, whenever it was put on that note, there is some reason to believe it was satisfactory to Mr. Stewart. At any rate he made no complaint about it,—he did not repudiate it, so far as the evidence shows. Moreover, gentlemen, when judgment was confessed on the note, when it was filed in the prothonotary's office, this indorsement remained thereon, it was not erased, and there is nothing in the confession of judgment tending to show that it was not considered a part of the instrument at that time, although, perhaps, that was not necessary.] [8]

" In the second place, the presumption of law is, that the note was delivered on the day of its date, that is, at the time of signing, and there is nothing whatever in this case, in the way of evidence, to show the contrary, or to show that it ever passed out of Mr. Stewart's possession until he sent it to his attorney. And, as I said before, the evidence shows that it came into the hands of the attorney in its present shape.

" [In the third place, gentlemen, the uncontradicted evidence is, that the memorandum is in the handwriting of John D. Irons, one of the defendants, and there is no evidence in the case tending to show that he had access to the note after its delivery.] [9]    [Now, is it more reasonable to believe that the memorandum was on the instrument when it was delivered by Eachel and Irons to Stewart, or that Irons had access to it later and wrote the memorandum there ? Is there any evidence at all tending to show that he had any opportunity to put that memorandum on the note after its delivery?] [10]    As I said before, the evidence is not contradicted that the memorandum is in Irons's own handwriting.   [Had it been in the handwriting of Mr. Stewart, who, so far as we can see from the evidence, had possession of the note after its delivery, then a question would arise as to when it was put on, and that would be, perhaps, a question more serious, more difficult to answer.] [11] But as you have no evidence, gentlemen, that Mr. Irons ever saw this note, had any access to it, or had any opportunity to write anything on it after it was delivered, you might, if you see proper, infer from this evidence that the memorandum was there when the note was delivered.   However, I leave it to you as a question of fact, calling your attention to the circumstances.

" Then, gentlemen, as to the meaning of the memorandum, supposing that you find the writing was on the back of the note at the time of the delivery of the instrument. As I said before, if it were not there, there is no defence. As to the meaning of this, it seems from the memorandum that there was a lease, known as No. 1, on the east part of the farm. The memorandum does not tell on whose farm. And if there were no farther evidence than what is furnished by this writing itself it would be left, perhaps, in considerable doubt and darkness. But, according to the testimony of Mr. Harrington, if he is believed, there were two leases on this farm ; and, indeed, they were offered in evidence just before the close of the evidence. It appears there were two leases granted by Mr. Stewart to the defendants in this case. Now, gentlemen, was lease No. 1 one of these leases, and the lease on the east part of Stewart's own farm ? That I leave to you as a matter for your decision under the evidence. The memorandum goes on and says, ' That provided the well on said lease should prove a good paying well.' Well, this means that if it did not prove a good paying well the note should not be paid, provided also, however, the well is to be completed within the year. Now, it was the duty of these men to complete a well on lease No. 1, on the east part of Stewart's farm, if that is what is meant in this memorandum, and that lease was on his, Stewart's farm ; it was their duty to complete that well within one year. If they found a good paying well, then they were bound to pay this note, otherwise they were not. But it seems, gentlemen, that, according to the theory of the defence here, that there was a change made afterwards by the parties, by agreement of the parties, in regard to the lease on which this well should be put down. According to the theory of the defence, a good paying well, at least a well that encouraged Stewart and these defendants, was struck adjoining or near the west side of the farm. [And it is said the parties came together and had an understanding that the well referred to in this memorandum and in lease No. 1 should not be put on that lease, should not be drilled on that lease, but put down on lease No. 2, for the reasons I have already suggested. It is alleged they were more likely to find oil on the west side of the farm, on lease No. 2, than they were on lease No. 1. Gentlemen, are you satisfied from the evidence this change was made and that

the agreement was changed? Because if you are, and the new agreement was carried out and the well was drilled on No. 2 lease within the year, that would be a sufficient compliance with this memorandum and there can be no recovery in this suit.] [12] You have heard the testimony of Mr. Harrington and the testimony of Mr. Duncan in regard to this change in the agreement. Unfortunately, gentlemen, the payee of the note, Mr. Stewart, is dead. By reason of his death the defendants cannot testify in their own behalf, and consequently we may not have as much light in this case as we would have if Mr. Stewart were living and here testifying, and the defendants testifying also. But there is evidence enough to take the case to you to consider, and on which to decide the case, and the court is required, under the law, to leave this matter for your decision. Was the change made, and was it, the changed agreement, carried out in good faith by the defendants? [According to the testimony of Mr. Harrington and Mr. Duncan, the second well, on lease No. 2, was completed not later than the first week of February, 1890. The note was given on April 25, 1889, and consequently that well would have been completed considerably within the year.] [13] And if it were completed, drilled on that lease No. 2, by agreement between Stewart and the defendants that it should take the place of the well to be drilled on lease No. 1, according to the memorandum, that would be sufficient. It seems, gentlemen, it was a dry hole, to use the language of the oil drillers; nothing was found in that well; it was not a good paying well, and that being the case the defendants should not be held liable, if they complied with all their agreements.

" Now, gentlemen, to recapitulate: You will first determine from the evidence whether this memorandum was on the note when it was delivered; if not, that is the end of the defence. If you find that the memorandum was there when it was delivered, you should next determine whether or not there was a change made in this written agreement by the parties at a later date. And was there a compliance with the agreement as changed? If there were, if the change was made by Stewart and the defendants, and if the defendants complied with their agreement to drill the well on No. 2, and found no oil there, did not find a good paying well, they are not liable.

" But, gentlemen, if there were no change made in this writ-

ten agreement, then, as it is conceded the well was not drilled on lease No. 1, of course the defendants would be liable for the face of the note with interest. You will decide all questions of fact by the weight or the preponderance of the evidence."

Verdict and judgment for defendants. Plaintiff appealed.

*Errors assigned,* were (1) that the verdict and judgment were erroneous; (2, 3) admission in evidence of memorandum on back of note, quoting bills of exception; (4) admission of testimony of Harrington and Duncan as to modification of agreement, but not quoting bills of exceptions or evidence; (5) refusal to strike out the testimony of Harrington and Duncan; (6) refusal to take the case from the jury; (7) the charge as a whole, quoting it; (8–13) portions of charge as in brackets, quoting them separately; (14) that the whole charge was unduly favorable to defendants, argumentative, and calculated to mislead the jury as to the proper force and effect of the evidence.

*D. A. Nelson,* for appellant.—A memorandum to become part of an instrument must show upon its face that it was so intended: Starr v. Light, 22 Wis. 430.

A sealed instrument cannot be wiped out of existence, except by such evidence as rises to the highest importance: Wilkinson v. Becker, 155 Pa. 194; Phillips v. Meily, 106 Pa. 536; Ott v. Oyer's Exrx., 106 Pa. 6; Sylvius v. Kosek, 117 Pa. 67.

The memorandum introduces a conditional change of time for payment, but not a condition to defeat the payment of the note.

The court interpreted the memorandum to the jury in such a manner that they believed it was a question for the court and not for the jury, and followed the court's opinion: Hershey v. Hershey, 8 S. & R. 333.

If defendants, after forfeiting lease No. 1, had it extended by drilling another well on lease No. 2, such extension of time could not operate to defeat payment of the note, being the consideration given for lease No. 2, when the testimony does not show any agreement to that effect and the note was not even mentioned.

The charge of the court, in general, was prejudicial to plaintiff's case and misleading as to the force and effect of the evi-

dence : Wenger v. Barnhart, 55 Pa. 300 ; P. R. R. v. Berry, 68 Pa. 272 ; Connelly v. Walker, 45 Pa. 449 ; Harrisburg Bank v. Forster, 8 Watts, 304 ; Wenrich & Co. v. Heffner, 38 Pa. 207 ; Work v. Maclay, 2 S. & R. 414 ; Reeves v. D. L. & W. R. R., 30 Pa. 454 ; Relf v. Rapp, 3 W. & S. 21 ; Parker v. Donaldson, 6 W. & S. 132 ; Garrett v. Gonter, 42 Pa. 143.

*John M. Buchanan, Lewis W. Reed* and *William A. McConnel* with him, for appellee.—All the evidence showed that the memorandum was placed on the back of the note at the time it was executed, and, if that were so, it formed a part of the note as much as if it were placed on the face : Geisinger's Est., 2 Dist. R. 735.

The memorandum would require no separate consideration, for it formed a part of the note.

The evidence to support defendant's claim was certainly more than a mere scintilla, and there was no evidence for plaintiff except the note and that contradicted by the memorandum. The court could not then withdraw the case from the jury : Gates v. Watt, 127 Pa. 20 ; Hineman v. Matthews, 138 Pa. 204.

If specific instructions were desired they should have been asked for : Grantz v. Price, 130 Pa. 415 ; Kurtz v. Haines, 15 Atl. R. 716 ; s. c. 2 Mona. 328.

OPINION BY MR. JUSTICE THOMPSON, November 13, 1893 :

The note upon which the judgment in this case was entered, and subsequently opened to let appellees into a defence, was dated April 25, 1889, and was made payable in one year from its date. The indorsement upon it was : " This note to be paid within two months after the year expires on lease No. 1 on east part of farm, provided the well on said lease should prove good paying well ; the well to be completed within the year." If this indorsement was a part of the note, its effect was to extend conditionally the date of its maturity for two months, and to negative any liability in case the well sunk upon the lease mentioned should not prove a good paying well. The first question, therefore, which arises is whether there was sufficient evidence to be submitted to the jury in regard to it. The learned trial judge said : " That if this memorandum were on the back of the note at the time the instrument was delivered it is as much a

part of the note as if it were written upon the face thereof, and just as binding upon the parties." If the parties made this indorsement a part of the note, and as such binding upon them, the place where it is written cannot change that effect.

The substantial question then was, did the parties so make it? The learned judge submitted it to the jury, and the evidence warranted him in so doing. The proofs showed that the note remained in the custody of R. W. Stewart, the decedent, up to the date of entering it, February 11, 1892; that it was retained with the indorsement upon it; that it was in the handwriting of John D. Irons, one of the appellees, who it is not suggested ever had access to it or opportunity to write anything on the note; that the well was to be located upon lease No. 2 instead of No. 1, and justified the conclusion that the indorsement was made at the time of the delivery of the note, and therefore was made a part of it. As it provides for the sinking of a well upon lease No. 1 the appellees were liable, unless R. W. Stewart waived his right to have it sunk there. It appears there were two leases between the same parties, Nos. 1 and 2, the former being upon the east half and the latter upon the west half of Stewart's farm. He doubtless wanted to develop his farm, and naturally was concerned about the sinking of a well at the point most likely to be successful. Charles Eachel, one of the appellees, conferred with him upon the subject and consulted him about its location. O. D. Harrington testifies: " Mr. Eachel desired to drill another well. He had drilled a well on No. 2 and desired to drill another one there, and Mr. Stewart agreed that he should do so and it should fulfill the requirements as related to lease No. 1." And C. W. Duncan testifies: " He said when the well was completed and she would come in dry, ' I wish we had drilled the well and kept the old location over on the other side.' " The well on No. 2 proved a dry well, and therefore if Stewart agreed to its location there instead of upon lease No. 1, appellees were not liable. The question under the evidence was for the jury, and the learned trial judge in submitting it to them cannot be convicted of error. His charge was not misleading.

The assignments of error are not sustained, and this judgment is affirmed.